IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CR282 |
| | ) | |
| v. | ) | |
| | ) | |
| KEITH B. STEWART, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the defendant's objections, Filing No. 40, to the report and recommendation (R&R) of the magistrate judge, Filing No. 29. The magistrate judge recommended denial of the defendant's motion to suppress, Filing No. 14. *See* Filing No. 29, Report, Recommendation and Order; Filing No. 35, Transcript (Tr.) at 99-100.

Pursuant to 28 U.S.C. § 636(b)(1)(A), the court has conducted a *de novo* determination of those portions of the R&R to which the defendant objects. *United States v. Lothridge*, 324 F. 3d 599, 600-01 (8th Cir. 2003). The court has reviewed the entire record including the transcript of the suppression hearing on September 21, 2009, and the digital video disc (DVD) of the encounter at issue. See Filing No. 35, Transcript; and Hearing Exhibit (Hr'g Ex.) 1, DVD. The court generally accepts the factual findings of the magistrate judge, but disagrees with the magistrate judge's application of the law to those facts. Accordingly, for the reasons set forth below, the court finds that defendant's motion to suppress should be granted.

The defendant has been charged with possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base, in

1

violation of 21 U.S.C. § 841 (a)(1).  Filing No. 1, Indictment.  The evidence adduced at the suppression hearing shows that Douglas County Sheriff's Deputy Andrew Woodward observed a red SUV parked in the parking lot of a Kwik Shop at 72nd Street & Crown Pointe Avenue in Omaha in the early morning hours of March 11, 2009.  Filing No. 35, Tr. at 5.  Deputy Woodward testified that the area surrounding the convenience store had been a "hot spot for a lot of criminal activity," including robberies, thefts and disturbances. *Id.* at 7.  Deputy Woodward testified that he thought the vehicle was suspicious because it "looked out of place" in the particular area of the Kwik Shop parking lot because "any normal person would have been parked up front close to the doors" due to the cold weather.  *Id.* at 6.  He testified he was also suspicious because the vehicle pulled up to a gas pump but he did not see anyone exit the vehicle to obtain gas.  *Id.* at 7.  He admitted, however, that he had no knowledge of how long the defendant had been at the gas station or what had previously transpired there.  *Id.* at 26.

While the defendant's vehicle was at the gas pump, Deputy Woodward drove his cruiser past it and obtained the license plate number.  *Id.* at 7.  At some point, he ran a computer check on the plates.  *Id.* at 28.  He stated that the license check had revealed no adverse information and he had not observed the defendant driving erratically.  *Id.* at 29-30.  He testified that he attempted to follow the vehicle once it left the station but lost sight of it, and stated that "it looked like the vehicle had ran from me."  *Id.* at 8.  Deputy Woodward testified that he did not stay in the Kwik Shop parking lot for the entire time the defendant's vehicle was there, but could not specify where he had gone, what he had done, or how long he was gone from the Kwik Shop.  *Id.* at 27.  He testified that at some

2

point he had contacted Douglas County Deputy Sheriff Jason Stelik on his cellphone. *Id.* at 52.

After he lost sight of the vehicle, Deputy Woodward drove into a nearby neighborhood to look for it, at deputy Stehlik's suggestion. *Id.* at 9, 56. He eventually located the SUV, parked with the engine running, in front of a residence at 69th Street and Ogden Avenue in Omaha. *Id.* at 9. Deputy Woodward illuminated the interior of the defendant's vehicle with his spotlight, and approached the vehicle to ask for the driver's license. *Id.* at 12, 13. He asked to see identification and asked the defendant what he was doing in the neighborhood. *Id.* at 39-40. Deputy Woodward advised the defendant that he was being questioned because of criminal activity at the Kwik Shop, including several robberies and thefts, though Deputy Woodward conceded he had no reports of criminal activity at the Kwik Shop, no reports that would have related to the defendant or anyone who matched his description, and no reason to connect the defendant with any other criminal activity. *Id.* at 25, 40, 42. In response to Deputy Woodward's inquiries, the defendant stated that he "was there for a friend of his who was sneaking around behind her husband's back." *Id.* at 40. The defendant later made reference to the woman's "boyfriend," which Deputy Woodward regarded as an inconsistency and as "suspicious." *Id.* at 40. Deputy Woodward testified he also doubted the defendant's explanation that he had been at the Kwik Shop to assist a friend with her car, though he conceded that he had no knowledge of any events that transpired before he arrived at the Kwik Shop. *Id.* at 41.

Deputy Woodward testified that the defendant looked for identification as requested, and that as the defendant did so, Deputy Woodward became concerned for his safety

3

because the defendant was moving around and looking in the console, under the seat and under his jacket. *Id.* at 11-12. He also stated that the defendant acted nervous and fidgety. *Id.* at 12. Deputy Woodward "became very fearful that the party possibly had a weapon on him and was going to use it on me," and began to unholster his service weapon. *Id.* at 11.

Deputy Woodward testified that he left the defendant in the vehicle and returned to his cruiser to run a computer records check of the defendant's driver's license. *Id.* at 33. The check revealed that the defendant "was a convicted felon with some type of drug history and some type of violent behavior," but no active warrants for his arrest and no problems with his license. *Id.* at 13, 34. Deputy Woodward then remained in the vehicle until Deputy Stehlik arrived at the scene as backup. *Id.* at 14, 52. After a brief discussion, the two officers then approached the defendant's vehicle. *Id.* at 57-58. Deputy Woodward asked the defendant to step out of the car and patted him down for weapons. *Id.* at 14. Deputy Woodward testified that the defendant consented to a search of his pockets. *Id.* at 15. He found a mesh pipe filter inside a cellophane bag in the defendant's pocket. *Id.* at 18. Deputy Woodward testified that he had no intention of issuing a citation for possession of drug paraphernalia to the defendant. *Id.* at 16, 53. He stated that his "main concern was just getting down information to pass along to our criminal investigations division" by way of a "field interview card." *Id.* at 16. He testified that it was standard operating procedure to "complete a field interview card any time [they] have contact with a suspicious person." *Id.* at 18. He stated that his intention was to have the defendant fill out the card and then to let him go. *Id.* at 53. Before letting the defendant go, Deputy

Woodward wanted to assure that he "wasn't going to be robbing the Kwik Shop or that he didn't have a weapon inside the vehicle." *Id.* Deputy Stehlik accompanied the defendant to the police cruiser while Deputy Woodward "searched the immediate area" of the front seat of the SUV for a weapon. *Id.* at 19. In the center console of the vehicle, Deputy Woodward found a tote bag that contained several bundles of U.S. currency, drugs and drug paraphernalia. *Id.* at 19-20.

The evidence shows that the police cruiser is equipped with a video recording device. *Id.* at 13. The camera and body microphone are activated when the cruiser's overhead emergency light or siren is turned on. *Id.* at 63. The recording equipment also has a separate switch to activate the body mike. *Id.* at 24. Woodward testified that the cruiser's lights and siren were never on. *Id.* at 23. He testified that he activated the video recording equipment after he approached the defendant for the first time. *Id.* at 33. He further testified that he "hit the record button on [his] dash camera" and believed that it would also activate the body microphone. *Id.* at 24. The video recording does not include sound from a body mike. *Id.* at 22. Deputy Stehlik was not wearing his body mike at the time he approached the vehicle. *Id.* at 62-63. Both officers testified that they had been trained to use the equipment. *Id.* at 24, 64.

Deputy Stehlik also testified at the hearing. *Id.* at 54-66. He testified that after he arrived at the parked vehicle, he spoke to Deputy Woodward about what had transpired "[a]nd while we were discussing this, I noticed the driver inside the vehicle motioning towards the center console and then underneath the seat several times while we were having this short conversation between the two of us." *Id.* at 57. He testified that the defendant was cooperative during the pat-down search. *Id.* at 59.

5

The defendant testified that he did not consent to a search of his pockets, and responded "no" to Deputy Woodward's inquiry. *Id.* at 67-68. He also testified that he had in fact purchased gas at the Kwik Shop and had been at the Kwik Shop to help a friend with a car that had been overheating. *Id.* at 70-71.

The DVD recording depicts Deputy Stehlik arriving at the location of the defendant's vehicle. *See* Hr'g Ex. 1, DVD at 2:53. One officer can be seen approaching the driver's side of the car, followed by another officer approaching the passenger side. *Id.* at 2:56. The defendant is shown exiting the car, immediately turning and placing his hands on the roof. *See id.* Both officers surround the defendant and one officer can be seen searching the defendant, including opening his coat, reaching into his pockets, and examining his socks and shoes. *Id.* at 2:56-3:01. The defendant is then led to the cruiser with his hands behind his back. *Id.* at 3:01. One officer returns to the SUV and enters the vehicle, first from the driver's side and later from the passenger's side. *Id.* at 3:02-3:08.

Once inside the cruiser, the cruiser's microphone records the conversation. *Id.* An officer can be heard questioning the defendant extensively, including asking his address, his social security number, where he worked, how many hours he worked, whether he owned the car, whether he had any ink on him or had tattoos or piercings, and whether he had a nickname. *Id.* at 3:03-3:08. After several minutes, the other officer returns to the vehicle and the officers can be heard placing handcuffs on the defendant. *Id.* at 3:08. The record shows that Deputy Woodward found crack cocaine in the front console of the vehicle. Filing No. 35, Tr. at 18-20.

The magistrate judge found that the initial encounter between Deputy Woodward and the defendant was a consensual encounter. *Id.* at 94. He found the encounter then

became an investigative detention. *Id.* at 96. He further found that after the initial conversation with the defendant, Deputy Woodward had a reasonable, articulable suspicion that criminal activity was afoot because "stories aren't adding up, the time of day doesn't make any sense, his presence in the area doesn't make any sense by address, and his presence in the area by his initial explanation—which is a change of story—concern[s] Woodward." *Id.* at 97. The magistrate judge found that the records check showing the defendant was a convicted felon with a violent history justified a pat-down and that the search of the vehicle was permissible for officer safety under *Michigan v. Long*, 463 U.S. 1032 (1983). *Id.* at 98.

The magistrate judge credited the testimony of the law enforcement officers, though he characterized Deputy Woodward's testimony as "interesting." *Id*. at 99. He acknowledged, however, that deputy Woodward's testimony was not definitive enough to show that the facts as testified by the defendant had not occurred, noting that "it's certainly within the realm of possibility that Stewart is in fact truthfully testifying about his reason for being [at the Kwik Shop] and what happened before." *Id.* at 92. He also noted that Deputy Woodward's testimony was "somewhat unclear" as to his comings and goings and his point of visibility, finding that "there's no reason to believe that [Deputy Woodward] had the defendant in view at all times, or the vehicle in view at all times." *Id.* at 90. He found Deputy Woodward's testimony about the time and the circumstances of the defendant's vehicle leaving the Kwik Shop was also unclear and found no factual support for Deputy Woodward's conclusion that the vehicle may have been trying to run or escape. *Id.* The magistrate judge found that Deputy Woodward had "issues with Stewart's answers" and the information that the defendant gave the officers, but acknowledged that the record

7

shows the only discrepancy in the defendant's story was the supposed inconsistency in the defendant's references to both a husband and a boyfriend.  *Id.* at 93.

The magistrate judge also reviewed the DVD of the encounter and noted that there was no sound on the video and "so [he could not] tell what's happening at that point in time [when the defendant exited the vehicle] from viewing the vehicle—or viewing the video, the DVD."  *Id.* at 93.  He stated that it appeared the defendant was "under direction to do something other than being patted down."  *Id.*

## DISCUSSION

A. Law

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions."  *Horton v. California*, 496 U.S. 128, 133 n. 4, (1990) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  Two of those exceptions are a search incident to arrest as described in *Chimel v. California*, 395 U.S. 752, 763 (1969), and a "reasonable suspicion of dangerousness" as articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Goodwin-Bey*, 584 F.3d 1117, 1119 (8th Cir. 2009) (noting that these exceptions apply to searches of vehicles under *New York v. Belton*, 453 U.S. 454 (1981), and *Michigan v. Long*, 463 U.S. 1032 (1983), respectively). The Supreme Court recently held that the search-incident-to-arrest exception "does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle."  *Arizona v. Gant*, — U.S. —, —, 129 S. Ct. 1710, 1714 (2009) (emphasis added).

8

The *Gant* decision confined the applicability of the search-incident-to-arrest exception to two situations. *United States v. Davis,* 569 F.3d 813, 816 (8th Cir. 2009). "[P]olice may 'search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'" *Id. (*quoting *Gant,* 569 F.3d at 1719). The "within-reach" requirement places the search-incident-to-arrest exception within the boundaries set by the underlying rationales of ensuring officer safety and protecting perishable evidence. *Id.* In addition to the within-reach requirement, circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle. *Id.* at 817; *Gant,* 129 S. Ct. at 1719.

*Gant* preserved, however, a police officer's authority "to search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is 'dangerous' and might access the vehicle to gain immediate control of weapons.'" *Gant,* 129 S. Ct. at 1721 (quoting *Long*, 463 U.S. at 1049). "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief . . . that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049.

The *Michigan v. Long* exception "does not mean that the police may conduct automobile searches <u>whenever</u> they conduct an investigative stop." *Id.* at 1050 n.14. (emphasis in original) (noting that the "preservation of evidence justification for a search does not exist in the *Terry* context" and that "officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified

9

in *Terry*"). Under *Terry* and *Michigan v. Long*, police are allowed "to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous" and "would pose a danger if permitted to reenter his vehicle." *Id.* at 1050 (finding reasonable apprehension of danger late at night in a rural area where the driver appeared intoxicated and police observed a long knife in the interior of the car the detainee was about to enter); *Terry*, 392 U.S. at 27 (acknowledging "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.") (emphasis added).

Similarly, to justify a patdown of a driver or a passenger during a traffic stop, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor a reasonable suspicion that the person subjected to the frisk is armed and dangerous. *Arizona v. Johnson*, — U.S. —, —, 129 S. Ct. 781, 784 (2009). Because the "sole justification" for such a search is the protection of the officer and others, its scope must be confined to a search reasonably designed to discover concealed weapons. *Terry,* 392 U.S. at 29; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."). An officer's decision to place a traffic offender in the back of a patrol car does not create a reasonable, articulable suspicion to justify a pat-down search that the circumstances would not otherwise allow. *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998) (involving traffic stop prompted by equipment violations).

10

The constitutional reasonableness of traffic stops and subsequent searches depends on an objective, not a subjective, standard. *United States v. Goodwin-Bey,* 584 F.3d at 1120. The critical inquiry is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27. In determining whether an officer acted reasonably in such circumstances, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.; see also Long*, 463 U.S. at 1050 (stating that a police officer must possess a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the belief that the suspect is dangerous and may gain immediate control of weapons); *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (more than a hunch necessary to justify frisking). If a suspect is "dangerous," he is no less dangerous simply because he is not arrested. *Long*, 463 U.S. at 1050.

To determine whether a seizure was conducted within the parameters of *Terry*, the court must determine whether the facts collectively provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis. *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008); *Glenn*, 152 F.3d at 1049 (stating that "[t]o decide whether there is a reasonable, articulable suspicion that a suspect is armed and presently dangerous, we consider the totality of circumstances known to the officer at the time of the search."). Although an officer's subjective perceptions of a driver's nervous behavior or evasive driving standing alone may not be sufficient to constitute a reasonable, articulable suspicion, when taken with other factors, those

11

perceptions contribute to the articulable suspicion. *Stachowiak,* 521 F.3d at 856; *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (stating "police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive"); *United States v. Bloomfield*, 40 F.3d 910, 918-19 (8th Cir. 1994) (explaining that nervousness and other subjective perceptions are valid factors supporting reasonable suspicion). An officer's mere knowledge that a suspect has been in jail does not amount to a reasonable, articulable suspicion that he armed and dangerous. *Glenn*, 152 F.3d at 1049; *but see United States v. Menard*, 95 F.3d 9, 10-11 (8th Cir. 1996) (finding reasonable, articulable suspicion because officer was outnumbered by vehicle's occupants, officer recognized one passenger as drug trafficker found to be carrying a weapon, and stop occurred late at night on deserted road); *and United States v. Abokhai*, 829 F.2d 666, 670 (8th Cir. 1987) (finding reasonable, articulable suspicion in suspect's equivocal responses to questions, recent armed robbery in the area, possible presence of a third person, and the suspect's suspicious behavior).

    B.  Analysis

The court agrees with the magistrate judge's conclusion that the initial contact with the defendant was consensual and that it shortly thereafter evolved into an investigative detention. However, the court disagrees with the magistrate judge's later findings that the investigative detention was supported by a reasonable, articulable suspicion and that concerns for officer safety justified the search of the vehicle.

This court's review of the transcript and the video show that the defendant acted as if he had been ordered out of the vehicle and the officer performed far more than a protective pat-down search. He conducted a lengthy, full-scale search of the defendant's

person, down to his socks. The officers offered contradictory and equivocal testimony with respect to their reasons for suspicion. Deputy Woodward's testimony, even if credited, does not establish an articulable and objectively reasonable basis for suspicion. His testimony with respect to his observations and the timing of his actions and observations was vague at best. The record shows that Deputy Woodward had not maintained continuous surveillance of the defendant at the Kwik Shop. There was no evidence to contradict the defendant's plausible testimony that he was at the Kwik Shop to help a friend with her car and that he had purchased gas there. Other than the defendant's allegedly suspicious presence at the Kwik Shop and the lateness of the hour, Deputy Woodward admitted that he had no reason to suspect the defendant of any criminal activity.

Moreover, even if the officers' testimony that they subjectively feared danger is credited, the testimony does not amount to a showing that a reasonably prudent officer would be warranted in the belief that his safety or that of others was in danger under these circumstances. Deputy Woodward's testimony that he observed allegedly furtive gestures is explained by the fact that the defendant was searching for his identification. Moreover, a reasonable apprehension of danger would have justified a pat-down or a search of the defendant's immediate area at that time, rather than later. The continued detention of the defendant for the supposed purpose of completing a field interview card is at odds with the professed reason for the search of the car. The video shows that Deputy Woodward was searching the car contemporaneously with the "field questioning" of the defendant. The officers had received no information from the computer records check from which they could conclude that the defendant was potentially armed and dangerous. Though they knew he had been convicted of a felony, they testified that they did not know the details of his conviction. Status as a felon and criminal history that suggests some degree of

violent behavior does not create suspicion of danger commensurate with a full-scale search of a vehicle.

Notably, this was not a traffic stop. There are no allegations of any motor vehicle violations. The defendant offered a reasonable explanation for his presence in the neighborhood at the late hour. His references to a woman's "boyfriend" and "husband" are not necessarily inconsistent and, even if they are, would not lead to any inference of dangerousness. The officers expressly disavowed any intent to arrest or charge the individual with possession of drug paraphernalia.

The court finds, considering the totality of factors, that the officers did not have a reasonable, articulable suspicion that defendant was armed and dangerous so as to justify a search of the interior of the vehicle. Several factors that would support an objective suspicion of dangerousness are absent. No officer was alone at the scene, two officers were present. There had been no reports of crime in the area on that night. The officers have articulated nothing other than a vague assertion that the defendant made "furtive gestures" to justify their search. They were not aware of the specifics of the defendant's criminal history, and knew only that he was a felon. There was no evidence that his criminal history involved the use of weapons and the officers were not aware of any information that linked the defendant to any other crime. The evidence shows that the officers were confronted only with a man in a car late at night, allegedly waiting to meet a woman. It is clear to the court that the officers had nothing more than an inchoate hunch, which is not sufficient under *Michigan v. Long* to justify a search of the interior of the defendant's vehicle.

The magistrate judge noted the incongruity, under *Gant*, of precluding a search incident to arrest while freely allowing a search once officers decide not to arrest an

individual. The government's expressed reliance on officer safety, and officer safety alone, to justify a search in these circumstances "implicates the central concern underlying the Fourth Amendment—the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *See Gant*, 129 S. Ct. at 1720. To allow the search of a vehicle any time a suspect is not arrested and is allowed to leave the scene presents the same concerns addressed in *Gant*, creating a risk that police will use the detention and subsequent release of a suspect "as a cover for a search which the Fourth Amendment otherwise prohibits" or to "condone purely exploratory searches of vehicles during which officers with no definite objective or reason for the search are allowed to rummage around in a car to see what they might find." *Id.* at 1720 n.5 (internal quotations omitted). That threat is obviated by the requirement that law enforcement officers articulate a reasonable suspicion that a defendant presents an objective risk of danger to the officers or others before a vehicle can be searched. The government has not presented the court with evidence of an objective suspicion of danger. Accordingly,

IT IS ORDERED:

1. The defendants' objection (Filing No. 40) to the report and recommendation of the magistrate judge is sustained;

2. The defendant's motion to suppress (Filing No. 14) is sustained.

DATED this 15th day of December, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge